**JET BLACK, LLC, Virginia E. Srednicki, Richard J. Srednicki, Storm Mountain Ranch, LLC, Mary K. Allen, David Rayner, Cheryl Rayner, Jim Carol, Cynthia Carol, Barry Gafner, Annette Gafner, Jeff Temple, Floren Enterprise Limited Partnership, Tom Kartsotis, Lynne Kartsotis, Link Family Trust, Michael H. Salsbury, Donna H. Triptow, Ogilvie Family Trust, Randall Reed, and Sherry D. Reed, Petitioners–Appellants,**

v.

**ROUTT COUNTY BOARD OF COUNTY COMMISSIONERS, Respondent– Appellee,**

and

**Colorado State Board of Assessment Appeals, Appellee.**

**No. 05CA0511.**

Colorado Court of Appeals, Div. II.

Oct. 5, 2006.

Rehearing Denied Dec. 28, 2006.

Certiorari Denied Aug. 27, 2007.

Sherman & Howard, L.L.C., Joseph J. Bronesky, Denver, Colorado, for Petitioners–Appellants.

John D. Merrill, County Attorney, Joanne Eldridge, Assistant County Attorney, Steamboat Springs, Colorado, for Respondent–Appellee.

John W. Suthers, Attorney General, John D. Baird, Assistant Attorney General, Denver, Colorado, for Appellee.

Opinion by Judge ROY.

Appellants Jet Black, LLC, Virginia E. and Richard J. Srednicki, Storm Mountain Ranch LLC, Mary K. Allen, David and Cheryl Rayner, Jim and Cynthia Carol, Barry and Annette Gafner, Jeff Temple, Floren Enterprise Limited Partnership, Tom and Lynne Kartsotis, Link Family Trust, Michael H. Salsbury and Donna H. Triptow, Ogilvie Family Trust, and Randall and Sherry D. Reed (collectively, the owners) appeal two orders from the Colorado State Board of Assessment Appeals (BAA) affirming the assessment of the Routt County Board of Commissioners (the board) of the common area parcels of their planned development to the individual lot owners and the method of valuation for the ownership parcels. We affirm.

This case presents the issue of the proper valuation for ad valorem property tax purposes of vacant agricultural residential lots in a fourteen lot common interest ownership community with extensive common area improvements. The lots in question sell for $2.5 to 3.0 million dollars as vacant land, share common interest improvements through a homeowner's association costing approximately $4.8 million to construct and $500,000 a year to maintain, are valued at $600 to $1,200 as vacant agricultural land, and the actual value for tax purposes should include the contribution of the common interest property.

Storm Mountain Ranch (the ranch) is a planned real estate development located in unincorporated Routt County approximately five miles south of Steamboat Springs at the base of Rabbit Ears Pass. The ranch abuts, and is connected to, Routt National Forest. It consists of approximately 1,063 acres and is classified as agricultural land for tax purposes. The ranch includes a fishery, a creek, wetlands, ponds, a trail system, a variety of wildlife, and land devoted to irrigation and dry land farming. A conservation easement held by the Yampa Valley Land Trust covers 793 acres of the ranch, including the five common area parcels and portions of some of the ownership parcels.

The ranch was developed as a planned community pursuant to the Colorado Common Interest Ownership Act (CCIOA), § 38–33.3–101, et seq., C.R.S.2006. The land was subdivided into fourteen ownership parcels and five common area parcels. Of the fourteen ownership parcels, two were approximately 35 acres in size and the remaining twelve were 70 acres in size with designated residential building sites. The five common area parcels, designated Parcels A—E, are owned by the Storm Mountain Ranch Homeowners Association (the HOA). The residential building sites are in relatively close proximity to each other and the ownership parcels are quite elongated. As a typical example, Owner Parcel 8 has a building site at its north end, is approximately 717 feet wide on the north boundary, is 408 feet wide on the south boundary, is approximately 7,875 feet long, and is approximately 35 feet wide at its narrowest point. Therefore, the vast majority of the land is quite remote from the residential building sites and is used for agricultural purposes.

The declarations provide that common expenses are to be shared equally by the owners. The only apparent advantage of owning one of the 70–acre ownership parcels, which are divided into subparcels (A and B) for tax purposes, is the right to construct more than one full residence.

The common area parcels comprise 184.86 acres, are relatively compact, and are scattered throughout the development. Parcel A is a 35–acre parcel with one cabin on it; parcel B is a 44–acre vacant parcel; parcel C is a 35–acre vacant parcel; parcel D is a 35–acre parcel that includes a stable and a pole barn/hay shed; and parcel E is a 35–acre parcel with a lodge, four surrounding cabins, and a horse barn. The predominant use of the common area parcels is as irrigated hay and meadow hay land. Part of Parcel E is used for dry land farming.

The common area parcels are specifically designated in the declarations as common interest property subject to development, partition, and resale restrictions. They are available for use solely by the owners for recreational purposes; they are not open to the public and cannot be rented out to non-owners. The lodge is a gathering place for friends and family and is used for community fundraisers, but is not available for lodging or commercial uses. The cabins are available for use by an owner who has not yet built a residence; or, once a residence is built, by an owner's family and social guests for one month at any one time without charge. Moreover, these common area parcels are limited to agricultural and recreational uses by virtue of the conservation easement.

Tax year 2002 was an intervening tax year for the owners. Accordingly, the owners saw no change to their Notice of Valuation for their ownership parcels which were valued at, with limited exceptions, $600 for a 35–acre ownership parcel and $1,200 for a 70–acre ownership parcel without improvements. This valuation did not include any contribution to value from the common area parcels, even as agricultural land.

In May 2002, the HOA received a Notice of Valuation for common area Parcel E improvements in the amount of $1,071,130. The Routt County Assessor's Office (the assessor) then issued a Notice of Determination, which recognized that the HOA could not be separately assessed and taxed for the common areas, but stated that the common area parcels would be taxed to the owners of the ownership parcels.

Then, in August 2002, the assessor issued a Special Notice of Valuation (SNOV) to each owner, adding to the actual value of the ownership parcel as agricultural land the actual value of the proportionate interest in the common area parcels and improvements, and thereby increasing the actual value of the ownership parcels by $149,780 for a 35–acre ownership parcel and $299,560 for a 70–acre ownership parcel. The assessor used the mass appraisal market value method of valuation.

The owners paid the tax and filed an abatement petition which was denied. They petitioned the BAA, which, after hearings, issued an order finding that the SNOVs had been properly issued. The BAA then scheduled a separate hearing on the issue of valuation. Ten days prior to the valuation hearing, the assessor issued a reappraisal using an extraction method that was designed to determine the contribution to the actual value of the ownership parcels made by the common area parcels and improvements. This contribution was determined to total just under $17.5 million. The BAA affirmed the methodology but further concluded that the ownership parcels were probably undervalued. This appeal followed.

I.

The owners first contend that the BAA erred in concluding that the SNOVs issued August 7, 2002, were properly issued. More specifically, the owners argue that the assessor improperly attributed the value of the common areas to the owner lots under § 38–33.3–105, C.R.S.2006. We conclude that the assessment was proper.

The owners agree, or do not dispute, that the actual value of the ownership parcels does not reflect the value of the common area parcels and improvements but that value is reflected in the sales prices of the unimproved ownership parcels. They assert that the market approach to valuation of common areas as set forth in the *Assessors Reference Library* is premised upon valuing residential improvements on *residential* land, and not residential improvements on *agricultural* land. In the former instance, the value of the common area would be reflected in the market value of the residential unit. Therefore, it would appear that if the ranch were classified as residential land rather than agricultural land, the value of the land only component for tax purposes would have been significantly higher than $600 to $1,200 for each ownership parcel, likely approaching the $2 million to $3 million price the owners paid. They view this dichotomy as permanent or lasting as to each ownership parcel, until residential improvements are constructed on it.

In interpreting a comprehensive legislative scheme such as the tax statutes, courts must give meaning to all the statutory provisions to further and give effect to the legislative intent. *Huddleston v. Grand County Bd. of Equalization,* 913 P.2d 15 (Colo.1996); *Xerox Corp. v. Bd. of County Comm'rs,* 87 P.3d 189 (Colo.App.2003). And, while we give deference to an administrative agency's interpretation of a statute, we are not bound by a decision that misapplies or misconstrues the law. *Welby Gardens v. Adams County Bd. of Equalization,* 71 P.3d 992 (Colo.2003). However, a BAA decision may not be set aside if it is supported by competent evidence and that correctly applies the law. *Bd. of Assessment Appeals v. Colorado Arlberg Club,* 762 P.2d 146 (Colo. 1988); *Burns v. Bd. of Assessment Appeals,* 820 P.2d 1175 (Colo.App.1991).

Fundamental principles contained in the Colorado Constitution, statutes, and case law governing taxation mandate that "all private and real and personal property is subject to payment of its fair proportion of taxation...." *Washington County Bd. of Equalization v. Petron Dev. Co.,* 109 P.3d 146, 149 (Colo.2005). For property tax purposes, real and personal property must be appraised and the value determined by the assessor of the county wherein such property is located. Section 39–1–103(5)(a), C.R.S.2006. The assessed value determines the proportionate share of the ad valorem real property tax assessed by the governmental entities within which the real property is located. That is, the owner of each taxable parcel pays a portion of the total ad valorem tax imposed that the value of the parcel bears to the valuation of all of the taxable parcels within the boundaries of the taxing entity. Therefore, subject to statutory preferences, it is important that all the real property be fairly valued throughout the county.

Colorado provides favorable ad valorem tax treatment to agricultural land. The "actual value" of non-agricultural land is determined by using one of three appraisal methods, the cost approach, the market approach, or the income approach. The actual value of agricultural land is determined "solely by consideration of the earning or productive capacity," resulting in a generally lower assessed value and a somewhat lower tax burden on agricultural land owners. Colo. Const. art. X, § 3(1)(a); § 39–1–103(5)(a); *Welby Gardens v. Adams County Bd. of Equalization, supra.* The value for assessment purposes is 21 percent of actual value for residential property and 29 percent for nonresidential property, including agricultural property. Section 39–1–104(1), C.R.S. 2006.

Here, the ranch is classified as agricultural land. The assessor testified that the value of the land is computed by using a ten-year rolling average of the production capability of the property. The calculated total agricultural land only value for the common area parcels was $51,920.

The common areas in a CCIOA are appraised and valued in accordance with § 38–33.3–105(2), C.R.S.2006, which provides in relevant part:

> In a condominium or planned community with common elements, each unit that has been created, together with its interest in the common elements, constitutes for all purposes a separate parcel of real estate and must be separately assessed and taxed. *The valuation of the common elements shall be assessed proportionately to each unit ... and in the case of a planned community in accordance with such unit's allocated common expense liability, set forth in the declaration, and the common elements shall not be separately taxed or assessed* (emphasis added).

*See also* § 39–1–103(10), C.R.S.2006. This statute forbids the taxation and assessment of the common areas to the homeowner's association, which typically, and in the present case, holds title. Further, the statute recognizes "that the value of the common elements is inherently included as a component of each individual unit's total actual value and will be assessed and taxed as part of an individual unit's overall assessment and taxation...." *Manor Vail Condo. Ass'n v. Bd. of Equalization,* 956 P.2d 654, 660 (Colo. App.1998).

The State Property Tax Administrator publishes the *Assessors Reference Library* (ARL)(rev.01–06), which assists county

assessors in valuing land. *See* § 39–2–109(1)(e), C.R.S.2006. Although not binding, we defer to statutory interpretations contained in the ARL. However, county assessors are bound by such interpretations. *Huddleston v. Grand County Bd. of Equalization, supra.*

Under valuation procedures for property owned by a common interest community, the ARL directs an assessor to "assess the common interest community's common elements with the residential real property owned by the unit owners." 3 *Assessors Reference Library* § VII at 7.7. The ARL provides two approaches to valuing common areas in a CCIOA community. First, the market approach states that any common interest community real property owned by the association "will be reflected in the actual (market) value of the individual units." 3 *Assessors Reference Library* § VII at 7.7. The ARL's other approach to the valuation of common areas contemplates a nonresidential (e.g., commercial) use of the common elements. This approach allows an assessor to apply the proper assessment ratio to a unit owner's share of the common elements where the use is not residential. This value is extracted from the market value of a unit to avoid a double assessment. Further, and as pertinent here, the ARL specifies that residential improvements located on farms and ranches, including garages, carports, storage sheds, fixtures, fences, and amenities integral to the residential use, are to be valued using the market value approach and assessed at the residential rate. 3 *Assessors Reference Library* § V at 5.83.

The valuation and assessment of a condominium's common elements and the ARL's approach thereto was addressed by another division of this court in *Manor Vail Condo. Ass'n v. Bd. of Equalization, supra.* In *Manor Vail,* a condominium association owned common elements including a lobby, a restaurant, meeting and conference rooms, and a swimming pool. The condominium owners received notices of valuation on their units including a line item for "commercial improvements" assessing each unit's proportionate share of the restaurant and meeting rooms at the commercial rate of 29 percent

as opposed to the lesser residential rate of 10.26 percent. The actual value of the condominium unit was comprised of multiple components: the land value, the value of the residential improvements of the unit itself, and the unit's proportionate share of the assessed value of the common area. The *Manor Vail* division held that the legislative scheme contemplates a variety of uses and classifications of property (agricultural, residential, commercial, or mining) and that the property value should be apportioned and allocated according to those uses. Thus, the different classifications will determine the assessment ratio to be applied to actual value when computing the assessed value. *Manor Vail Condo. Ass'n v. Bd. of Equalization, supra.*

■ Here, the owners assert that because the Colorado Constitution limits the actual value of agricultural property to its productive capacity and the ranch sits upon agricultural land, it was error for the county separately to assess and tax the common elements to their ownership parcels. Their expert testified that the common area parcels have no market value, and, in any event, the common area parcels are included in the underlying agricultural land value.

The assessor initially determined that the actual value of the common area parcels as agricultural land was $51,920 and that the actual value of common area improvements was $4,195,510, of which $160,690 represented agricultural improvements and $4,034,820 represented residential improvements. This actual value amount was based upon a mass appraisal method using the market approach.

The BAA concluded that because agricultural land valuation statutes consider only the productive capacity of the land, the market value of the improvements to the common area parcels was not being captured on the tax assessment rolls. Because there is no exemption from taxation for the improvements, the BAA determined that the nonagricultural improvements constructed in the common elements on land taxed as agricultural land must be appraised separately and the actual value passed through to the owners.

■ Our analysis begins by noting that the market value of the ownership parcels as vacant land was between $2.5 and $3 million at the time the SNOVs were issued, while the actual value of the land for tax purposes valued for agricultural use was $600 to $700 for 35–acre ownership parcels and $1,200 to $1,400 for 70–acre ownership parcels. In our view, the common area must be accounted for as a separate component of property tax valuation. The ARL's second approach to valuation of the common elements, which specifically addresses nonresidential common element improvements on residential land, recognizes, as does the *Manor Vail* analysis, the various components of the property which need to be separately valued and assessed based upon their actual classification and actual use. We conclude that this approach is equally applicable to residential common elements constructed or installed on agricultural land and comports with the overall scheme of property taxation. *Manor Vail Condo. Ass'n v. Bd. of Equalization, supra* (statutory provisions must be construed to further the legislative intent of a comprehensive legislative scheme such as the taxation statutes). As such, the assessment of the common area parcels as reflected in the August 2002 SNOVs was proper.

## II.

The owners contend that it was error to add the common element area as previously omitted property. We disagree.

■ Section 39–5–125(1), C.R.S.2006, addresses the ability of the assessor to add omitted property to the tax rolls:

> Whenever it is discovered that any taxable property has been omitted from the assessment roll of any year or series of years, the assessor shall immediately determine the value of such omitted property and shall list the same on the assessment roll of the year in which the discovery was made and shall notify the treasurer of any unpaid taxes on such property for prior years.

Hence, § 39–5–125(1) authorizes retroactive assessments of taxes for prior years on previously omitted property, but not on omitted value. *See In Stitches, Inc. v. Denver County Bd. of Comm'rs*, 62 P.3d 1080 (Colo.App. 2002); *Cabot Petroleum Corp. v. Yuma County Bd. of Equalization*, 847 P.2d 152 (Colo.App.1992), *rev'd on other grounds*, 856 P.2d 844 (Colo.1993); *see also Chew v. Bd. of Assessment Appeals*, 673 P.2d 1028 (Colo.App.1983)(concluding that § 39–5–125(1) is unambiguous).

■ The owners object, arguing that the common area parcels are not separate taxable property, and therefore could not be added onto the tax rolls pursuant to § 39–5–125(1). While we agree that the common area parcels cannot be separately valued and assessed, presumably to the homeowner's association, we have already concluded that the common area parcels may be proportionately assessed to and with the ownership parcels to the extent they contribute to the value of the ownership parcels. Prior to 2002, the common area parcels had not been taxed to anyone, even as unimproved agricultural land. Because the common area was not captured on the tax rolls prior to 2002, we conclude that it was not error to add them through the SNOVs.

The owners also argue that prior to issuing the SNOVs, the assessor removed the lodge improvements on Parcel E from the tax rolls after erroneously assessing it to the HOA. However, in her June 2002 Notice of Determination withdrawing the assessment to the association, the assessor explained, "This property has been changed from commercial/ agricultural to exempt for property tax purposes. This value will be included in the individual accounts of lot owners at a later date." Testimony confirmed that the assessor was attempting to find the proper method for valuing and assessing the common area.

Our conclusion is buttressed, in part, by the following language from § 39–1–103(5)(a):

> The actual value of agricultural lands, exclusive of building improvements thereon, shall be determined by consideration of the earning or productive capacity of such lands during a reasonable period of time, capitalized at a rate of thirteen percent. *Land that is valued as agricultural and*

*that becomes subject to a perpetual conservation easement shall continue to be valued as agricultural notwithstanding its dedication for conservation purposes; except that, if any portion of such land is actually used for nonagricultural commercial or residential purposes, that portion shall be valued according to such use. The actual value of residential real property shall be determined solely by consideration of the market approach to appraisal.*

(Emphasis added.)

█ Here, it is undisputed that the common area is subject to a conservation easement, and it is also undisputed that the lodge and cabins are a residential use. Therefore, those improvements and the ground under them are to be valued based on market value, and not in accordance with the special procedure for agricultural land and improvements.

We do not perceive any error in the assessor's addition of the common area parcels in the SNOVs here or in the BAA's approval.

### III.

The owners contend that the extraction method used by the assessor to value the common area parcels was in error. We disagree.

At the outset, we note that the extraction method is not new. It appears to have been used when there are mixed uses in one property, e.g., residential and commercial, or, as here, residential and agricultural. *See Manor Vail Condo. Ass'n v. Bd. of Equalization, supra* (residential and commercial); 3 *Assessors Reference Library* § V at 5.83 (residential and agricultural).

The assessor initially valued the improvements on the common area parcels by using a separate market value for each improvement. However, the assessor changed her valuation methodology to an extraction method prior to the BAA hearing on valuation. The extraction method did not attempt to determine the actual value of the common area parcels. Instead, it determined the contribution of the common area parcels to the actual value of the ownership parcels. Therefore, contrary to the owners' position, the common area parcels were never valued at $17,502,800, though under these circumstances, it is difficult to distinguish the practical difference between valuing the common area parcels at $17,502,800, and the results of the extraction method of valuation utilized by the assessor.

While there may be more than one way to apply an extraction method of appraisal, the assessor used it to determine the contribution of the common area to the value of each ownership parcel. This was accomplished, according to the assessor by a five step analysis, to wit:

First, a market value of the subject [owner] parcel as though vacant, without consideration of agricultural classification, will be established using sales activity within [the ranch] development. This establishes the market value for all components of value combined, i.e. the land parcel and the interest in the common elements.

Second, comparable sales will be used to determine a value for the subject land [ownership] parcel without an interest in the common elements. Sales selected will be premier [vacant] lots reflective of [the ranch]'s location and topographical features, but with little or no common element interest being included with the purchase. Adjustments will then be made for the following elements of comparison: market conditions, conditions of sale, location/ desirability, [ownership] parcel size, access, utilities, live water and public land adjacency.

Third, with two of the components of value determined, the third can be calculated. The math is as follows: Overall Market Value (all components) [of the ownership parcel determined in step one] minus Market Value Land Only (one component) [determined in step two from comparable sales] equals Contributory Market Value of the Common Elements (one component).

Fourth, involves subtracting out the market value of the common element land because it is also classified as agricultural, and adding back in the agricultural land value based upon the required statutorily defined valuation process.

[Fifth], a market value of the improvements located on the homestead [owner parcel] is added to the concluded agricultural land and interest in common element value through analysis of sales that have had the land values adjusted out, leaving only that portion of the sale price relevant to the improvements for comparison purposes.

First, the determination of the market value of the ownership parcels, is relatively simple because sales and resales of vacant lots in Storm Mountain Ranch are readily available. The assessor then used the overall market value of the ownership parcels, which was $2.55 million for the 70–acre parcels and $2.4 million for the 35–acre parcels.

Second, comparable sales of vacant land without, or with limited, common elements must be identified and compared. The assessor used two large lot subdivisions and several sales of unplatted land. One subdivision located immediately to the north of Storm Mountain Ranch contained significant improvements within its boundaries, such as a championship golf course and related facilities. But while these improvements may have created a pleasant setting, they were not accessible to the lot owners by virtue of their ownership. The improvements were accessible only to members of a private club for which there was a substantial initiation fee and annual dues. Following an extended analysis, the assessor concluded that the land only value of the ownership parcels was $1 million for 70–acre ownership parcels and $850,000 for 35–acre parcels. The relatively small differential in value is attributed to the recognition that the only advantage of the larger ownership parcel is the ability to construct an additional full-sized residence.

Third, using a 70–acre ownership parcel as an example, the assessor subtracted $1 million from $2.55 million and concluded that the common elements contributed $1.55 million to the value of the ownership parcel.

Fourth, the market value of the common area parcels as vacant land must be extracted and the agricultural value for them substituted. Because the common area parcels are approximately 35 acres, the assessor assigned to each common area parcel the same value previously assigned to 35–acre ownership parcels, or $850,000, for a total common area vacant land value of $4,250,000, or $303,500 for each ownership parcel. Then the agricultural actual value for the common area parcels, $51,920, or $3,700 for each ownership parcel was substituted. The resulting calculation was, therefore, $1.55 million— $303,500 + $3,700 = $1,250,200.

And, fifth, the $1,250,200 contribution to the value of the common area was added to the actual value of agricultural ownership parcel, $1,200, for an actual value of $1,251,400 for each 70–acre ownership parcel. It is the contribution value of the common area value of approximately $1,250,000, which when multiplied by fourteen equals $17,500,000, and leads the owners to argue that the assessor determined the actual value of the common area to be $17,500,000.

The BAA upheld the extraction methodology, but disagreed with the land only market values. The BAA determined that the comparables used were inferior to the ownership lots and that the actual value of the ownership parcels was "nearer 2 million per site, which would reduce the contributory value of the common element interest to $839,400 for each of the 14 privately held sites." The BAA noted that because its actual value was higher than the assessor's value for the common elements in the 2002 SNOVs, they were without authority to increase the value. We do not fully understand why the fourth step in the methodology is necessary under the circumstances of this case, but, because it benefits the taxpayers, we need not resolve the issue.

■ The owners argue that this method of determining actual value denies them the benefit of agricultural land valuation. That is simply not the case. The land underlying the residences on ownership parcels and the residential improvements on the common area parcels remains taxed as agricultural land using an extraction method as to both. That is, the value of residential land under comparable residences and improvements on residential land is extracted from the actual value of those comparables and the agricultural land value is substituted. Absent the

application of § 39–1–103(5)(a), the owners here would enjoy the benefit of the agricultural classification of the land and would pay lower taxes than owners of comparable residences and improvements on residential land.

Therefore, we conclude that the orders of the BAA should be affirmed.

Judge ROTHENBERG and Judge HAWTHORNE concur.